**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 09-cv-02476-CMA-MJW

WILLIE BARLOW, JR.,

      Plaintiff,

v.

C.R. ENGLAND, INC.,

      Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
VACATING TRIAL DATES**

---

This matter is before the Court on Defendant C.R. England, Inc.'s Motion for
Summary Judgment.  (Doc. #55.)  For the following reasons, the Motion is granted, the
Final Trial Preparation Conference scheduled for September 9, 2011, and the five-day
jury trial set to commence on September 26, 2011, are VACATED.

## I. PROCEDURAL HISTORY

This action arises from Defendant's termination of Plaintiff Willie Barlow, Jr. from
his job as a security guard and Defendant's termination of an oral contractual
arrangement with Plaintiff's company, E & W Janitorial, for the provision of janitorial
services.  On October 14, 2009, Plaintiff, who initiated this action *pro se*, filed a motion
and affidavit for leave to proceed under 28 U.S.C. § 1915.  (Doc. #1.)  On October 22,
2009, Plaintiff filed a Title VII Complaint (Doc. #3), and he amended his Complaint on

October 27, 2009 (Doc. #5).  On February 21, 2010, counsel entered her appearance

on Plaintiff's behalf (Doc. #22), and on April 16, 2010, with leave of Court, Plaintiff filed

a Second Amended Complaint ("Complaint") (Doc. #37).  Plaintiff asserts the following

five claims of relief: (1) racial discrimination pursuant to 42 U.S.C. § 1981(a) (Claim 1);

(2) violation of the Americans with Disabilities Act (Claim 2); (3) wrongful discharge in

violation of public policy (Claim 3); (4) race discrimination in violation of Title VII (Claim

4); and (5) violation of the Fair Labor Standards Act (Claim 5).

On February 25, 2011, Defendant filed the instant Motion for Summary

Judgment.  (Doc. #55.)  Plaintiff responded on April 7, 2011 (Doc. #68), and Defendant

replied on April 18, 2011 (Doc. #71).

## II.  <u>**FACTUAL BACKGROUND**</u>[1]

The site manager for Defendant's maintenance yard, John Smith, hired Plaintiff

in February 2005, as a maintenance yard security guard.  Mr. Smith served as Plaintiff's

supervisor.  Plaintiff worked on Friday, Saturday, and Sunday nights from 6:30 p.m. until

6 a.m., at the latest.  During his shifts, Plaintiff was the only security guard on duty.  A

man by the name of Scott Clark covered the remaining night shifts.

As a security guard, Plaintiff's duties included making rounds of the maintenance

yard, which comprises an entire city block, to ensure that nothing was amiss on the

property and logging the trucks that entered and left the property.  Plaintiff was also

---

[1]  Unless otherwise noted, the following facts are undisputed and are taken from the parties' pleadings, briefs, and attached exhibits.  Additionally, at the outset, the Court will provide a limited recitation of the facts and will discuss additional facts, as needed, when addressing the merits of Plaintiff's claims.

responsible for reporting anything unusual, including missing company property.

A majority of the maintenance yard is secured by a fence with an overhead gate for

ingress and egress.  In addition to keeping property, supplies, and equipment within the

fence's perimeters, Defendant also stored such items on its property outside the fenced

area.  Further, in April 2008, much of the property that Defendant typically stored in the

secured area was kept in the unsecured area because Defendant was in the process of

cleaning out one of its storerooms.  Amongst these items were two trailer doors, which

were left on the ground next to a Dumpster and covered by discarded pallets.

In addition to security services, in February 2007, Plaintiff started to perform

maintenance services for Defendant's office building through a company called E & W

Janitorial & Maintenance Services ("E & W") that he formed with his business partner,

Ernestine Hudson.  In connection with E & W, Plaintiff and Ms. Hudson obtained a

cleaning license for E & W, created invoices and a separate bank account for E & W,

and filed a separate income tax return for E & W.

On June 6, 2007, Plaintiff was injured while performing security guard duties,

when a 300-400 pound automatic gate used to enter Defendant's maintenance yard

malfunctioned and hit Plaintiff on his head (the "June 6 Accident").  As a result of the

injuries he sustained, Plaintiff claims to suffer from balance problems and disabling pain

in his back, neck, head, and jaw, all of which interfere with his ability to work and make

it difficult for him to stand, walk, lift, and stoop.  As a result of these injuries, Plaintiff's

physician imposed a lifting restriction of not more than 25 pounds.  Additionally,

Plaintiff's injuries made it difficult for him to perform certain tasks such as moving pallets and breaking up crates.  However, Plaintiff never asked Defendant for any accommodation for his disability; rather, on occasion, Plaintiff simply asked mechanics for assistance.  Additionally, Plaintiff had access to and used a forklift to move pallets and break up crates.  Plaintiff did not have difficulty performing any other aspect of his job.

On June 7, 2007, Plaintiff filed a workers' compensation claim in connection with his injuries.  Plaintiff continued to obtain workers' compensation for nearly one year, until his employment with Defendant as a security guard was terminated on April 30, 2008.  As time passed after the June 6 Accident, Mr. Smith got a general sense that some of Defendant's employees, such as Darlene Niebuhr, the Workers' Compensation Manager, and Len Klimiuk, Mr. Smith's boss, were concerned about possible malingering due to the delay in Plaintiff's recovery from his injuries and Plaintiff's continued receipt of worker's compensation benefits.

In December 2007, Mr. Smith terminated Defendant's contract with E & W Janitorial, due to his concern that (1) Plaintiff was performing janitorial services during his security guard shifts and (2) in performing the janitorial services, Plaintiff was lifting weight that exceeded his twenty-five pound limitation.

During Plaintiff's security guard shift for the weekend beginning April 25, 2007, two trailer doors that had been stored outside Defendant's secured gated area, ten feet away from a Dumpster, went missing.  The doors, weighing 300 pounds each and

4

valued at approximately $2,000.00, were located on the ground and attached to wooden pallets with a metal band.  Mr. Smith noticed that the doors were missing, upon his arrival at work on the Monday morning following Plaintiff's weekend shift.  In an attempt to investigate, Mr. Smith examined video recordings of Defendant's facility from over the weekend.  One of the videos captured a truck with two men arriving at Defendant's maintenance yard and approaching the area where the trailer doors were located.  Defendant represents that the video captured the trailer doors on the back of the truck.  Plaintiff disputes this representation.  However, there is no dispute that the trailer doors went missing and that Plaintiff failed to notice the truck's arrival and departure and failed to notice that the trailer doors had disappeared.

On April 30, 2008, Mr. Smith terminated Plaintiff's employment as a security guard, as a result of Plaintiff's failure to notice and report that the trailer doors were stolen from Defendant's property during Plaintiff's shift.  Plaintiff disputes the basis for his termination and asserts that he was not responsible for taking an inventory of everything on Defendant's property; Plaintiff maintains that he was terminated under circumstances giving rise to an inference of discrimination.  Despite Plaintiff's termination and the incident giving rise thereto, Mr. Smith had favorably evaluated Plaintiff's performance and described him as "honest," "stable," and "dependable;" Mr. Smith had never warned Plaintiff about his performance.

In further support of his claim of race discrimination, Plaintiff points to a single instance that occurred in March 2008 where a co-worker, Randy Wimer, told a joke

5

which repeated a Richard Pryor comedy routine and included the use of the word,

"nigger" in the presence of Mr. Barlow and others.  Plaintiff asserts that, after that joke,

he was never again invited to lunch in Mr. Smith's office.  The parties disagree as to the

reasons why Plaintiff never attended another lunch in Mr. Smith's office.  The parties

also disagree as to whether Plaintiff was offended by the joke.  However, Plaintiff admits

that he never complained to the co-worker, Mr. Smith, Defendant's corporate

headquarters, or human resources about the joke.  Nor did Plaintiff ever mentioned

the joke until he filed the filed a discrimination charge with the Equal Employment

Opportunity Commission ("EEOC").  Plaintiff also admits that he did not hear any other

offensive jokes or use of any racial epithets during his presence while he was employed

by Defendant.

### III.  <u>STANDARD OF REVIEW</u>

The purpose of a summary judgment motion is to assess whether trial is

necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Fed. R. Civ. P.

56(c) provides that summary judgment shall be granted if "the pleadings, the discovery

and disclosure of materials on file, and any affidavits show that there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter

of law." A fact is "material" if it pertains to an element of a claim or defense; a factual

dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a

reasonable jury could return a verdict for either party. *See Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). However, the nonmoving party "must do more

than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"The mere existence of a scintilla of evidence in support of the [nonmoving party's]

position will be insufficient; there must be evidence on which the jury could reasonably

find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

"The movant bears the initial burden of making a prima facie demonstration of

the absence of a genuine issue of material fact and entitlement to judgment as a matter

of law." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing

*Celotex*, 477 U.S. at 323). The "movant may make its prima facie demonstration [of the

absence of a genuine issue of material fact] by simply pointing out to the court a lack

of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.*

at 671.  After the movant has met its initial burden, the burden shifts to the

nonmovant to put forth sufficient evidence for each essential element of the claim such

that a reasonable jury could find in its favor. *See Anderson*, 277 U.S. at 248; *Simms v.*

*Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326

(10th Cir. 1999). The nonmovant must go beyond the allegations and denials of his

pleadings and provide admissible evidence,[2] which, as mentioned, the Court views in

the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995)

---

[2]  While the parties need not present evidence "in a form that would be admissible at trial, [ ] the content or substance of the evidence must be admissible." *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995).

(citing *Celotex*, 477 U.S. at 324). However, conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

## IV. ANALYSIS

### A.   CLAIM 1: RACIAL DISCRIMINATION PURSUANT TO 42 U.S.C. § 1981(a) AND CLAIM 4: RACE DISCRIMINATION IN VIOLATION OF TITLE VII

In his Complaint, Plaintiff lodges a racial discrimination claim pursuant to 42 U.S.C. § 1983.  Specifically, Plaintiff asserts that, by terminating him, Defendant subjected him to racial discrimination and disparate treatment because of his race. Further, Plaintiff alleges that Defendant deliberately and willfully discriminated against him by "modifying [his] job duties to set him up for failure, not intervening when racial jokes were told at an employee sponsored lunch, not providing [him] with transportation so that he could patrol the Commerce City facility in a timely manner, failing to evaluate [him] and make salary determinations at that time and then terminating him."  (Doc. #37, ¶ 83.)  Finally, Plaintiff asserts that his race was a "determinative factor" in Defendant's termination decision.  (*Id.*, ¶ 85.)

Plaintiff also lodges a claim of race discrimination in violation of Title VII of the Civil Rights Act of 1964, which prohibits an employer from discriminating against any individual on the basis of race, color, religion, sex, or national origin.  In support, Plaintiff alleges that Defendant treated him "differently than other similarly situated employees outside his protected class and created a hostile work environment."  (*Id.*, ¶ 113.)  As

with his § 1981, Plaintiff asserts that Defendant's stated reasons for his termination

were pretextual and that his termination was racially motivated.  (*Id.* ¶ 114.)

"Section 1981 forbids all intentional racial discrimination in the making or

enforcement of private or public contracts.  In particular, § 1981 protects employees

from racial discrimination both in entering into an employment contract and in enjoying

the benefits, privileges, terms and conditions of employment."  *Exum v. U.S. Olympic

Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004) (internal citations omitted).  The

traditional three-step burden-shifting analysis of *McDonnell-Douglas v. Green*, 411 U.S.

792 (1973) applies to 42 U.S.C. § 1981 claims where the plaintiff relies on

circumstantial, rather than direct, evidence.  *Id.*

To establish a claim for wrongful termination under § 1981, a plaintiff must show

(1) membership in a protected class; (2) that he suffered an adverse employment

action; and (3) that the adverse employment action occurred under circumstances

which give rise to an inference of unlawful discrimination.  *E.E.O.C. v. PVNF, L.L.C.*,

487 F.3d 790, 800 (10th Cir. 2007) (citing *Sorbo v. United Parcel Serv.*, 432 F.3d 1169,

1173 (10th Cir. 2005)).  An inference of discriminatory motive can arise from various

circumstances, including actions or remarks made by decision makers that could be

viewed as reflecting a discriminatory animus, or preferential treatment given to

employees outside the protected class.  *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir.

2005).  Although "courts must be sensitive to the myriad of ways such an inference can

be created," there must at least be a logical connection between the elements of the

*prima facie* case and the illegal discrimination. *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181-82 (10th Cir. 2002) (internal quotations omitted) (quoting *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990)).

If the plaintiff meets this burden of establishing a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the termination. 296 F.3d at 1181-82. If the defendant satisfies this burden, then the burden shifts back to the plaintiff to show that the defendant's proffered reasons are pretextual. *Id.* Pretext may be established with evidence showing one of three situations: (1) the defendant's stated reason for the termination was false; (2) the defendant acted contrary to a written company policy prescribing the action taken by the defendant under the circumstances; or (3) the plaintiff was treated differently from other similarly-situated employees who violated work rules of comparable seriousness. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). A plaintiff can demonstrate pretext by revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason." *Morgan v. Hilti*, *Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). Summary judgment for the defendant is warranted only if the plaintiff has "failed to produce any evidence from which a reasonable inference could be drawn" that the defendant's proffered reasons were pretextual. *Salguero v. City of Clovis*, 366 F.3d

1168, 1176 (10th Cir. 2004).  The elements of a *prima facie* case under 42 U.S.C.

§ 1981 are the same as for a *prima facie* case under Title VII.  *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991).  Accordingly, the Court will jointly analyze Plaintiff's Claims 1 and 4, which allege violations of 42 U.S.C. § 1981 and Title VII, respectively.

      1.    <u>Plaintiff has failed to establish a *prima facie* case of unlawful termination on grounds of racial discrimination</u>

Conducting the aforementioned analysis, the Court finds that Plaintiff has failed to establish a *prima facie* case of unlawful termination.  There is no dispute that Plaintiff belongs to a protected class and that he was terminated.  However, Plaintiff has not identified competent evidence that, if taken as true, would establish circumstances giving rise to an inference of discrimination.  Tellingly, Plaintiff fails to address whether he has met his burden of establishing a *prima facie* case at the first step of the aforementioned three-step burden shifting test.  Moreover, Plaintiff fails to point the Court's attention to record evidence that enables him to satisfy his burden.  Rather, Plaintiff immediately jumps to the final stage of the three-part test and asserts that "there is ample evidence of pretext."  (Doc. #68 at 19.)

The reasons for Plaintiff's attempt to sidestep his first-step burden are obvious: there is no evidence in the record that Mr. Smith, the undisputed decision maker, had a discriminatory motive for terminating Plaintiff or for purportedly "modifying" Plaintiff's job

duties,[3] not giving him performance evaluations,[4] and getting rid of a company vehicle that Plaintiff used to patrol Defendant's facility[5] (the "Employment and Business Decisions").  Plaintiff's suggestions to the contrary are conclusory and speculative.  The record contains evidence of only **one** potentially racially-charged situation during Plaintiff's more than three years of employment at C.R. England, Inc., namely an ill-advised joke that involved the N-word, which joke was told by another C.R. England employee in Plaintiff's presence and in Mr. Smith's office during a workplace lunch.

Although Mr. Smith was not the teller of the joke, Plaintiff intimates that Mr. Smith endorsed the joke and any racial sentiments contained therein because "Mr. Smith did not say anything about the joke being inappropriate at the time."  (Doc. #55, ¶ 28.) However, such evidence is far too tangential, conclusory, and speculative to support an

---

[3] Interestingly, in the Complaint, Plaintiff fails to articulate the basis for his allegation that Defendant modified Plaintiff's job duties "to set him up for failure."  Elsewhere in the Complaint, Plaintiff alleges that "the security guard duties were modified to include a portion of the janitorial duties."  (Doc. #37, ¶ 42.)  However, Plaintiff's own statement of facts in opposition to Defendant's Motion for Summary Judgment, citations to the record, and Defendant's responses thereto reveal that Plaintiff was to provide janitorial services through his own company, separate and apart from his guard duties.  Further, there is no dispute that this arrangement was made for economic reasons, *i.e.*, to provide Plaintiff with additional income and to enable Defendant to manage its overtime costs.  (Doc. #68, ¶¶ 6-9; Doc. #71, ¶¶ 6-9.)

[4] Although Plaintiff alleges in the Complaint that Defendant failed to give him performance evaluations, it is undisputed that Mr. Smith had favorably evaluated Plaintiff's performance in the past; described him as "honest," "stable," and "dependable;" and never previously warned Plaintiff about his performance.  (Doc. #68, ¶ 72; Doc. #71, ¶ 72.)

[5] Also in the Complaint, Plaintiff alleges that, on April 25, 2008, Mr. Smith told him that he had to patrol Defendant's facility on foot, he could no longer patrol Defendant's facility using a company truck because the truck was either out of commission or on loan to another employee.  (Doc. #37, ¶ 58.)  However, in opposition to Defendant's Motion for Summary Judgment, Plaintiff fails to provide any evidence in support of these allegations or explain how these allegations support his § 1981 and Title VII claims.

inference of discrimination underlying Mr. Smith's decision to terminate Plaintiff. Moreover, even if the teller of the joke had discriminatory views, Plaintiff has failed to present evidence that such discriminatory views were held by Mr. Smith, the maker of the at-issue employment decisions, or were so pervasive as to infect the company's culture or office environment.  Further, that Mr. Smith encouraged Plaintiff to work additional hours by providing cleaning services for Defendant through a company Plaintiff owned, undercuts Plaintiff's assertion that Mr. Smith harbored a discriminatory animus and that Plaintiff's termination was racially motivated.  Moreover, Plaintiff has not shown a nexus between the purportedly offensive joke and Mr. Smith's decision to terminate Plaintiff or the other Employment and Business Decisions.  *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (stating, "[i]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions"); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (stating "In order to rely on [allegedly discriminatory] statements, [the plaintiff] must show that they are made by a decision maker, and that there was a nexus between the discriminatory statements and the decision to terminate."). Therefore, based on the foregoing, the Court finds that Plaintiff has failed to establish a *prima facie* case of discriminatory termination.

  2. <u>Defendant's Presentation of a Legitimate, Non-Discriminatory Reason</u>

   Even if Plaintiff had established a *prima facie* case of discriminatory termination, the Court finds that Defendant is entitled to summary judgment on Plaintiff's § 1981

and Title VII claims because it presented evidence of a legitimate, non-discriminatory reason for Plaintiff's termination, and Plaintiff has failed to establish that Defendant's proffered reason was pretextual.

Defendant has presented evidence that Mr. Smith terminated Plaintiff because Plaintiff "failed to notice and report the stolen trailer doors, and more importantly, failed to accept that his position as a security guard made him responsible for being aware of what was on the C.R. England property, and to report missing property." (Doc. #55 at 13.) Although Plaintiff asserts that, as a security guard, he was "not required to know each specific item that was on the property but to monitor and patrol the property and report anything unusual," (Doc. #68, at 7, ¶ 45), Plaintiff admits that his security duties included "mak[ing] sure everything on the property was in order, and to log the trucks that came in and out of the property." (Doc. #55 at 2, ¶ 5; Doc. #68 at 4, ¶ 5.) Accordingly, the Court finds that Defendant has presented a legitimate, non-discriminatory reason for Plaintiff's termination.

    3.    Plaintiff's Failure to Establish Pretext

A reason to terminate is not pretextual "unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (original emphasis omitted). The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *abrogation on*

*other grounds recognized by Boyer v. Cordant Techs., Inc.*, 316 F.3d 1137 (10th Cir. 2003).  Plaintiff bears the burden of showing that each reason given by the employer is unworthy of credence.  *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005).  A court may not "act as a super personnel department that second guesses employers' business judgments."  *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999).

Plaintiff asserts that Defendant's proffered reason for terminating him is pretextual.  Specifically, Plaintiff asserts that "the evidence permits a reasonable inference that [Mr. Smith] acted with an ulterior motive and engineered and manufactured the reasons proffered for terminating" Plaintiff.  (Doc. #68 at 19.) However, Plaintiff fails to cite to any evidence concerning racial discrimination in support of this theory.  Rather, Plaintiff's theory rests on his filing for workers' compensation, which has nothing to do with his § 1981 claim.  Additionally, Plaintiff baldly asserts that "[i]t is simply implausible that after three years of good service and no complaints[,] Smith would seriously began [sic] to question that Mr. Barlow was not adequately performing his job and would not have informed him of the missing doors had he been aware of them."  (*Id.* at 21.)  Finally, although Plaintiff alleges in his Complaint that he was treated differently from similarly-situated employees, Plaintiff fails to identify a similarly-situated employee who engaged in a similar lapse at work but was more favorably treated by Defendant.  In sum, Plaintiff has failed to present evidence that

15

Defendant's stated reason for Plaintiff's termination was false and that discrimination was the real reason.

Accordingly, the Court finds that summary judgment in Defendant's favor is warranted in connection with Plaintiff's first claim for racial discrimination pursuant to 42 U.S.C. § 1981(a) and fourth claim for race discrimination in violation of Title VII.

**B.      CLAIM 2:  VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

In support of the Americans with Disabilities Act ("ADA") claim, Plaintiff asserts, in pertinent part, that: (1) he was a person with a disability within the meaning of the ADA, 42 U.S.C. § 12102(2); (2) Defendant knew of Plaintiff's disability and/or regarded Plaintiff as having a disability; (3) Plaintiff was a qualified individual with a disability within the meaning of 42 U.S.C. § 12111(8) in that he was able to perform the essential functions of the position either with or without a reasonable accommodation; (4) Plaintiff's disability and/or Defendant's belief that Plaintiff was disabled was a substantial and/or motivating factor in Defendant's decision to fire Plaintiff; (5) Defendant's stated reasons for firing Plaintiff were pretextual in that Defendant concocted a false and unjustified reason for firing Plaintiff while at the same time falsely advising Plaintiff and his physician that Defendant had found another job for Plaintiff in a nursing home; (6) Defendant failed and/or refused to provide a reasonable accommodation for Plaintiff's disability; and (7) Defendant insulted and belittled Plaintiff for his perceived disability.

In the absence of direct evidence of discrimination on the basis disability, courts apply the *McDonnell Douglas* burden-shifting analysis.  *MacKenzie v. City & Cnty. of*

*Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005).  Thus, a plaintiff must first establish a *prima facie* case of discrimination.

In order to establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must demonstrate that he "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability."  *Justice v. Crown Cork and Seal Co., Inc.*, 527 F.3d 1080, 1086 (10th Cir. 2008).  A plaintiff demonstrates discrimination by showing that he suffered an "adverse employment action because of the disability."  *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001).  The ADA defines "disability" as "(A) a physical or mental impairment that **substantially** limits one or more major life activities[6] of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]"  42 U.S.C. § 12102(1) (emphasis added).

In his quest to survive summary judgment, Plaintiff asserts that he "does not claim an actual disability as defined by the ADA.  However, [Defendant] did regard him

---

[6] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

as having a disability." (Doc. #68 at 22.)[7]  For the following reasons, the Court finds that summary judgment in Defendant's favor is warranted.

First, Plaintiff bears the burden of "articulat[ing] with precision the impairment alleged and the major life activity affected by that impairment, and the court is to analyze only those activities identified by the plaintiff.  Whether the plaintiff has an impairment within the meaning of the ADA is a question of law for the court to decide. Whether the conduct affected is a major life activity for purposes of the Act is also a legal question for the court."  *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003) (internal quotation and citation omitted).

Prior to the 2008 amendments which more clearly defined the words, "regarded as," a plaintiff had to "show that an employer has mistaken beliefs about the plaintiff's abilities: the employer 'must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.  Moreover, the employer must mistakenly believe that the impairment substantially limits the employee in one or more

---

[7]  Plaintiff relies on the 2008 amendments to the ADA, which further define "regarded as."  Pursuant to that amendment, an individual is regarded as having an impairment "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an **actual** or **perceived** physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A) (emphasis added).  Impairments will not be "regarded as" a disability if they are "transitory" (*i.e.* expected to last for six months or less) or "minor."  The 2008 amendments became effective on January 1, 2009.  However, these amendments do not apply retroactively to the at-issue Employment Decisions, which concluded with Plaintiff's termination on April 30, 2008.  *See*, *e.g.*, *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1217 n.7 (10th Cir. 2010); *Hennagir v. Utah Dep't of Corrs.*, 587 F.3d 1255, 1262 n.2 (10th Cir. 2009).

major life activities." *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1190 (10th Cir. 2007) (internal quotation and citations omitted).

In the instant case, Plaintiff appears to identify the 25-pound lifting restriction as his impairment and lifting or working as the major life activity affected by that impairment. (*See* Doc. #68 at 22; Doc. #37, ¶ 93). Additionally, in the Complaint, Plaintiff asserts that Defendant "regarded Plaintiff as substantially limited in his ability to lift or in his ability to work at England as well as in a class of jobs or a broad range of jobs in various classes in the geographic area surrounding the Commerce City facility." (Doc. #37, ¶ 93.) However, Plaintiff's own statement of facts greatly undermines his claim that Defendant regarded him as disabled. In particular, Plaintiff states and Defendant admits that, "on March 13, 2008, [and again on April 10, 2008,] Mr. Barlow gave Smith a copy of his physicians [sic] report with a 25 pound lifting restriction. Smith told Barlow that there was nothing wrong with him and he needed to do his job." (Doc. #68 at 13, ¶ 39; 14, ¶ 43; Doc. # 71 at 12, ¶ 39; 13, ¶ 43.) Additionally, Plaintiff's deposition testimony reveals that moving pallets and breaking up crates were the **only** aspects of his job which he had difficulty performing and, when he needed help, he would ask the mechanics for assistance or use a forklift. (Doc. #55-2 at 95:11-96:20; 170). Moreover, Plaintiff does not genuinely dispute that he never requested any accommodation for any disability during the time he worked at C.R. England. (*Compare* Doc. #55 at 7, ¶ 37 *with* Doc. #68 at 7, ¶ 37.) Finally, because the record fails to demonstrate that Mr. Smith, the at-issue decision maker, regarded Plaintiff as disabled,

the record fails to establish a causal link between the termination decision and Plaintiff's
purported disability.

Therefore, based on the undisputed facts, Defendant did not regard Plaintiff as
disabled.  Accordingly, because the record demonstrates that Defendant did not regard
Plaintiff as disabled and Plaintiff acknowledges that he was not actually disabled as
defined by the ADA, the Court finds that summary judgment in Defendant's favor is
warranted in connection with Plaintiff's ADA claim.  *See Endlich v. Yellow Corp.*, 182
F. App'x 825, 829 (10th Cir. June 26, 2006) (unpublished) (affirming summary judgment
for the defendant where the plaintiff failed to provide any evidence of how the employer
regarded him as being substantially limited in any major life activity); *Hemsing v. Philips
Semiconductors*, No. 98-2033, 1999 WL 476017, at *3 (10th Cir. July 9, 1999)
(unpublished) (affirming lower court's entry of summary judgment for defendant where
the plaintiff failed to provide evidence in support of a causal link between the termination
decision and the plaintiff's disability).

**C.   CLAIM 3:  WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY**

In support of his wrongful discharge in violation of public policy claim, Plaintiff
asserts that Defendant terminated him in retaliation for his filing a workers'
compensation claim, pursuant to the Workers' Compensation Act of Colorado, Colo.
Rev. Stat. § 8-40-101, *et seq.*  Though not entirely clear, Plaintiff's wrongful discharge
claim appears to be premised on both the decision to end the janitorial-services contract

in November 2007 and the decision to terminate Plaintiff from his security guard employment in April 2008.

To establish a *prima facie* case for wrongful discharge, an at-will employee must present evidence that: (1) the employer directed the employee to perform an illegal act as part of the employee's work-related duties or prohibited him from performing a public duty or exercising an important job-related right or privilege; (2) that the action directed by the employer would violate a specific statute on the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or his right or privilege as a worker; (3) the employee was terminated as the result of refusing to perform the act directed by the employer or for exercising the privilege to which the employee was entitled; and (4) that the employer was aware or reasonably should have been aware that the employee's refusal to comply with the employer's order was based on the employee's reasonable belief that the action ordered was illegal, contrary to clearly expressed statutory policy related to the employee's duty as a citizen, or violative of the employee's legal right or privilege as a worker.  *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1235 (10th Cir. 1997) (citing *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 109 (Colo. 1992)).  It is well-established that an employer's retaliation against an employee for his exercise of his right to apply for and receive compensation under the Workers' Compensation Act of Colorado, Colo. Rev. Stat. §§ 8-40-101 through 8-66-112, violates Colorado's public policy.  *See Miedema v. Browning-Ferris Indus. of Colo.*, 716 F. Supp.

1369, 1371-72 (D. Colo. 1989); *Lathrop v. Entenmann's, Inc.*, 770 P.2d 1367, 1373 (Colo. Ct. App. 1989).

In the instant case, Plaintiff identifies twenty-three facts in the record that he contends support his claim of wrongful discharge in violation of public policy and allow the claim to withstand summary judgment.  (*See* Doc. #68 at 24-26.)  In sum, these facts concern the misgivings of Darlene Niebuhr, Defendant's Workers' Compensation Manager and a third-party claims adjuster, in connection with Plaintiff's workers' compensation claims, the length of time Plaintiff was taking to heal, and Plaintiff's changing stories about the incident leading to his injuries.  However, nothing in the record indicates that Ms. Niebuhr or the third-party claims adjuster were involved in Mr. Smith's termination decision or that Mr. Smith was involved in the processing or handling of Plaintiff's workers' compensation claim.  Plaintiff only vaguely, and without any factual support, intimates through his recitation of the facts that Ms. Niebuhr influenced Mr. Smith's termination decision.

Additionally, Plaintiff mistakenly represents that Mr. Smith "fired Mr. Barlow [from his janitorial services], in part 'because of the workman's comp issue.  It was starting to put both of us in an unfavorable light.'" (*Id.* at 26, ¶ 19) (citing to paragraph 28 of Plaintiff's Statement of Additional Disputed Facts).  However, a review of the original source of this "unfavorable light" remark (*i.e.*, Mr. Smith's deposition testimony) reveals that Plaintiff has taken the remark out of context to support his theory.  First, Mr. Smith was discussing his November 2007 decision to terminate Defendant's contract with

22

Plaintiff for the provision of janitorial services **through Plaintiff's own company**; Mr. Smith was not discussing the April 2008 termination of Plaintiff's employment as **an employee on Defendant's payroll**.  Thus, because Plaintiff did not perform janitorial services as an at-will employee, Defendant's decision to end the janitorial services contract is irrelevant to his wrongful discharge claim.  Second, in explaining his rationale for terminating the contract, Mr. Smith noted that, in providing janitorial services, Plaintiff was required to lift a five-gallon mop bucket, which exceeded Plaintiff's 25-pound lifting restriction, and which requirement would "come back on both of us" as a result of "the workman's comp issue."  (*See* Doc. #68-2 at 66: 14-24.)  In other words, Plaintiff's provision of janitorial services would only serve to aggravate his injuries for which he was then receiving workers' compensation as a security guard employee.  Mr. Smith also noted instances in which Plaintiff "double-dipped" by providing janitorial services during his security guard shifts.  Therefore, the Court finds that no reasonable jury could find that Mr. Smith ended the janitorial services contract in retaliation for Plaintiff's workers' compensation claims as a security guard employee.

Regarding the April 2008 decision to terminate Plaintiff from his employment with Defendant as a security guard, Plaintiff has not presented any evidence that establishes a causal connection between his workers' compensation claim and his termination.  As previously noted, Plaintiff has failed to present any evidence that Mr. Smith's termination decision was influenced by anyone involved in the processing and handling of Plaintiff's workers' compensation claims, that the decision was premised upon

Plaintiff's workers' compensation claim filings, or that Mr. Smith interfered in any way with Plaintiff's filing for workers' compensation.

Accordingly, for the foregoing reasons, the Court finds that summary judgment in Defendant's favor is warranted in connection with Plaintiff's wrongful discharge in violation of public policy claim.

**D.      CLAIM 5:  VIOLATION OF FAIR LABOR STANDARDS ACT**

In support of his violation of the Fair Labor Standards Act ("FLSA") claim, Plaintiff asserts that, in his duties as a security guard and provider of janitorial services, he was "required by Defendant to work long hours during the course of his employment and was not appropriately compensated for the hours of employment, contrary to the provisions of the FLSA," and that Defendant has "deprived [him] of the statutory compensation required by the FLSA and as a direct or proximate result of the Defendant's action, Plaintiff has lost wages and benefits."  (Doc. #37, ¶¶ 121, 122.)

In support of its Motion for Summary Judgment, Defendant asserts that, with respect to the provision of janitorial services, Plaintiff was an independent contractor and, therefore, the FLSA does not apply.  (Doc. #55 at 22-24.)  For the reasons discussed below, the Court agrees.

It is well-established that the FLSA's overtime compensation provision applies only to employees, not independent contractors.  *See Weisgerber v. Allstate Ins. Co.*, No. 99-S-2073, 2001 U.S. Dist. LEXIS 26405, at *11 (D. Colo. Mar. 8, 2001) (citing 29 U.S.C. §§ 203(e)(1) and 207(a)).  Under the FLSA, whether a worker is an independent

contractor or an employee is a question of law.  *Weisgerber*, 2001 U.S. Dist. LEXIS 26405, at *11-12 (citing *Duplan v. Harper*, 188 F.3d 1195, 1200 (10th Cir. 1999)).

The Tenth Circuit has identified an "economic reality test" to determine whether a worker is an employee or an independent contractor.  *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998).  "The focal point is whether the individual is economically dependent on the business to which he renders service . . . or is, as a matter of economic fact, in business for himself," is the primary consideration.  *Id.* (internal quotation and citation omitted).  Courts also consider the following factors in applying the economic reality test:

(1)     the worker's opportunity for profit or loss;

(2)     who supplied the instrumentalities, tools, and place of work;

(3)     the worker's role in hiring and paying assistants;

(4)     the degree of skill involved;

(5)     the method of compensation;

(6)     length of time for which services are to be performed;

(7)     intent of the parties;

(8)     whether the work performed is part of the principal's regular business; and

(9)     benefits and tax treatment.

*Id.*  Because no single factor is conclusive, courts must look to the totality of circumstances surrounding the parties' relationship.  *Id.* at 1441.

In the instant case, the record contains evidence that Plaintiff and his business partner provided janitorial services to Defendant through a company that Plaintiff had formed with another person and for which he obtained a cleaning license.  Pursuant to that business relationship, Plaintiff invoiced Defendant for the provided services, and Defendant issued checks made payable to Plaintiff's company for the services rendered.  Additionally, Plaintiff's company had its own bank account and filed a separate corporate tax return as a limited liability company.  Although the record demonstrates that Mr. Smith met with Plaintiff to inform him of the janitorial tasks that needed to be performed, Plaintiff's deposition testimony reveals that he had the freedom to decide how to accomplish those tasks.  (Doc. #55-2 at 54-55.)  Such input or exercise of control is not inconsistent with one's status as an independent contractor and may be necessary to ensure that the end result contracted for is reached. *Weisberger*, 2001 U.S. Dist. LEXIS 26405, at *14 (citing *Carpet Exch. of Denver, Inc. v. Indus. Claim Appeals Office*, 859 P.2d 278, 281 (Colo. Ct. App. 1993)).  Thus, the evidence demonstrates that Plaintiff was in business for himself.  That Plaintiff provided services to a company for which he was also employed as a security guard is irrelevant and does not undo his status as an independent contractor.  Plaintiff has pointed to no authority that would suggest otherwise, and the Court is aware of none.  Accordingly, for the foregoing reasons, the Court finds that summary judgment in Defendant's favor is warranted in connection with Plaintiff's FLSA claim.

## V.  **CONCLUSION**

Accordingly, IT IS ORDERED THAT:

(1)     Defendant's Motion for Summary Judgment (Doc. #55) is GRANTED;

(2)     This case is DISMISSED WITH PREJUDICE;

(3)     The parties shall bear their own fees; and

(4)     The Final Trial Preparation Conference, set for September 9, 2011, and

the five-day jury trial, set to commence on September 26, 2011, are

VACATED.

DATED:  September   07  , 2011

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge